John J. SHIELDS, Ann C. Shields, Ann C. Shields as Trustee for Karen A. Shields, Suzanne Shields, Cynthia Shields and John J. Shields, Jr., Karen A. Shields, Suzanne Shields, Cynthia Shields and John J. Shields as representative of John J. Shields, Jr., a minor, Plaintiffs,

v.

Daniel F. SHIELDS, Beatrice F. Shields, Beatrice F. Shields as Trustee for Daniel Christopher Shields and Virginia Ellen Shields, Daniel F. Shields, III, as representative of Daniel Christopher Shields and Virginia Ellen Shields, minors, Virginia S. Shields, and Shields Development Company, a Delaware corporation, Defendants.

Court of Chancery of Delaware,
New Castle County.
Submitted: July 15, 1985.
Decided: July 22, 1985.

Robert E. Schlusser, and Steven J. Stirparo, of Schlusser and Reiver, Wilmington, for plaintiffs.

Peter J. Walsh, and Jeffrey M. Weiner, of Bayard, Handelman & Murdoch, P.A., Wilmington, for defendants other than Virginia Shields.

Thomas J. Healy, of Healy & Collins, Wilmington, for defendant Virginia S. Shields.

## OPINION

ALLEN, Chancellor.

This action seeks an order (1) specifically enforcing the terms of a stockholders' agreement restricting the transfer of the common stock of Shields Development Company ("Old Shields"), a Delaware corporation, (2) enjoining the voting by defendants of stock owned of record by them in a successor Delaware corporation of the

same name ("New Shields"), (3) setting aside the incorporation of New Shields and granting other relief. The parties constitute all of the shareholders of Shields Development Company and the principal antagonists are John J. and Daniel F. Shields, brothers who, after a lifetime spent working together in their family enterprises, have now apparently fallen out.

The pending application is for a preliminary injunction prohibiting New Shields from selling its assets, other than in the ordinary course of its business, pending the outcome of this litigation and prohibiting the individual defendants from voting their shares in New Shields to approve any such transfer. The urgency justifying this request for the extraordinary remedy of preliminary injunction arises from the fact that New Shields has now entered into a contract, scheduled to close on July 31, 1985, for the sale of its major asset—certain real estate located in Greenville, Delaware. Plaintiffs will, they claim, be irreparably injured should that sale be permitted to occur.

## I

The background of the present dispute is involved but largely uncontested. For purposes of deciding the pending application the pertinent facts appear to be as follows.

The principal antagonists are surviving children of Daniel F. Shields, Jr., who for a number of years operated a business in Greenville, Delaware, known as Shields Lumber and Coal Company (the "Lumber Company"). Mr. Shields and his wife were blessed with four children. As these children reached adulthood during the 1940's Mr. Shields made substantially equal gifts of the stock of the Lumber Company to each of them. During that period, Mr. Shields and his four children constituted all of the shareholders of the Lumber Company. In 1949, Mr. Shields, who maintained majority shareholder status in the family business throughout his life, proposed that all of the stockholders of the Lumber Company enter into an agreement, the thrust of which was in each case to give the other shareholders (1) a right of first refusal with respect to the sale by any shareholder of his or her stock and (2) option on such stock exercisable on the death of its owner. The contract established book value as the price at which such option would be exercised. Each shareholder agreed to this proposal.

Among the assets of the Lumber Company was a nine-acre parcel of real estate located in Greenville, Delaware. At some point the Lumber Company established a wholly-owned subsidiary—Old Shields—and conveyed this land to that subsidiary. In 1966, apparently for tax reasons, the Lumber Company distributed all of the stock in Old Shields to its shareholders as a stock dividend. Mr. Shields and his children—constituting all of the shareholders of Old Shields—then entered into an agreement restricting the transfer of the shares of Old Shields which was in material respects identical to the agreement that had for years by then been in place with respect to the stock of the Lumber Company. It is this agreement (the "1966 Agreement") that plaintiffs rely upon as the source of the legal rights asserted in this action.

It seems agreed that the central purpose of both the 1966 Agreement and the earlier Lumber Company stock restriction agreement was to provide family members with an ability to exclude others from ownership interests with them in the family business. As written, however, the agreements had another effect and nothing in the record indicates that such other effect was intended. That other effect might be referred to as the lottery aspect of the agreements. It is this second aspect or effect of the 1966 Agreement that created the situation out of which this litigation grows.

The lottery effect comes about as follows. The 1966 Agreement had several operative provisions including provisions that:

(1) Each signatory (acting jointly with other signatories so electing) pos-

sessed a right of first refusal with respect to the stock of any other signatory; i.e., a right to match any bona fide third party offer for the stock;

(2) In the absence of bona fide third party offers, if a signatory desired to transfer in any fashion (by gift, will, pledge, sale, etc.) his or her stock, such stock had first to be offered to the other signatories (first jointly, then severally) for sale at book value; and

(3) In the event of a signatory's death the surviving parties (or the Old Shields Company itself at the direction of a majority of its shareholders) could elect to buy the subject stock from the estate of such deceased signatory at book value.

I refer to the 1966 Agreement as having a lottery effect because stock in Old Shields was probably unmarketable in the hands of any single shareholder[1] and, at least in recent years, if a shareholder predeceased his or her fellow shareholders, the book value option price formula contained in the agreement guaranteed that the estate of such shareholder would not receive a proportionate share of the fair market value of Old Shields assets. Thus, under the terms of the 1966 Agreement the last surviving child of Mr. Shields would realize all of the appreciation of the real estate assets of Old Shields that had been experienced over the years and the pre-deceasing family members would receive none of that value. This lottery effect has already been visited upon the estates of two of the children of Mr. Shields, William

and Rosemary, who died in 1976 and 1974 respectively.[2]

The dimensions of the gamble required by the 1966 Agreement can be calculated from the record in this matter. It appears that the book value of Old Shields (approximately $255,000) equals approximately $1/16$ of the market value of the assets formerly owned by that Company.[3]

Indeed what I have called the lottery effect of the 1966 Agreement has already lead to litigation in this Court when the present antagonists caused Old Shields to enforce its rights (as a surrogate for a majority of its shareholders) to redeem William Shields' shares in Old Shields at then book value upon his death. William's widow, as personal representative of his estate, refused to recognize this action asserting a number of grounds to justify that position. This Court considered each such ground and concluded that the 1966 Agreement was valid and enforceable by Old Shields. See *Shields Development Company v. Helen D. Shields*, Del.Ch., C.A. 5530, Brown, V.C. (December 8, 1981) (unreported).

The experience of William's estate at their own hands served no doubt as a warning to the surviving brothers. During the pendency of the litigation to enforce the terms of the 1966 Agreement against the family of their deceased brother, John and Daniel Shields agreed to permit each other to transfer by gift shares of Old Shields to their respective wives, individually and as trustee for their various children.[4] Accord-

1. It is unlikely that any third party would have a serious interest in negotiating the purchase of a minority interest in a closely-held family business, particularly when he or she would know that their best offer could always be defeated by an equal offer from present shareholders.

2. Mr. Shields himself died in 1970. His stock in the family business was bequeathed in equal shares to each of his children (all of whom were then alive) with the exception of a bequest of 5.65 shares to his widow, defendant Virginia S. Shields (which constitutes approximately 5.13% of all outstanding shares). There was no attempt to exercise rights under the 1966 Agreement with respect to Mr. Shields' shares, pre-

sumably because each of the remaining signatories to that agreement took equally in absence of such exercise in any case.

3. The contract of sale the closing of which the pending motion seeks to restrain calls for a cash price of $4,180,000 for the real estate in question, which constitutes substantially all of the assets of Shields Development Company.

4. The parties dispute whether these transfers were made pursuant to a waiver of rights by all interested parties to the 1966 Agreement or whether they were made in contravention of the rights of another party to that Agreement (Vir-

ingly in November, 1976, and May, 1977, John and Daniel transferred to their wives individually and as trustee for their children substantial portions of their holdings in Old Shields. The fact of these transfers by John and Daniel—required to mitigate the harsh aspects of the lottery effect of the 1966 Agreement—was not disclosed to this Court when it was asked to strictly enforce the terms of the 1966 Agreement against the estate of William Shields. Whether the stock so transferred was itself subject to the restrictions of the 1966 Agreement is something about which the parties apparently do not agree, although arguably it was.

Even as mitigated by gifts of stock to family members, the lottery effect is still very substantial. It seems clear that it represents a gamble that Daniel Shields at least no longer wants to take.

Several solutions to the problem posed by the price provision of the 1966 Agreement would be possible. The first and simplest would be to amend the stockholders' agreement to provide a new price formula hinged to fair current values rather than book value. John Shields has apparently not concurred in this modification or at least is unwilling to do so on terms that Daniel Shields is willing to accept. A more radical course to avoid the risks of the lottery effect would entail the sale of Old Shields' assets at their market value and the distribution in liquidation of the proceeds to all shareholders. This course would minimally require the concurrence of the members of the Daniel Shields family (who together own 47.55% of the company's stock) and of Virginia S. Shields (a 5.13% shareholder), the step-mother of the principal antagonists, in order to be effectuated.

Virginia Shields has apparently concluded that a termination of business relations between Daniel and John Shields is appropriate. John Shields and his family, however, while not opposing the termination of

business relations between Daniel and John in concept, opposed the notion of liquidating Old Shields. At the same time John Shields would not agree to a modification in the price provision of the 1966 Agreement. His suggested course of action was the sale of the Daniel Shields family interests to him at a price that has now been shown to be substantially below the pro rata value achievable through liquidation.

Thus on May 24, 1984, at a reconvened stockholders' meeting, a majority of the stockholders of Old Shields took various actions, over the dissent of the John Shields family stockholders. Those actions, *inter alia*, removed John Shields as one of two directors of the company and adopted a plan of liquidation for the company.

Implementation of such a plan would obviously require some time and—in the face of the surviving Shields brothers' inability to agree to a modified stockholder agreement—some risk of the lottery effect would necessarily be run during such period. To counter that risk and to provide to all shareholders the benefits of a stockholders' agreement with a realistic price formula, the board of Old Shields (comprised only of Daniel Shields) and a majority of its shareholders approved on July 17, 1984, an Agreement and Plan of Merger between Old Shields and a newly formed subsidiary of Old Shields, SM Company. The Merger Agreement contemplated a stock for stock merger with SM Company acting as the surviving corporation.

The merger was effectuated on July 18, 1984, and SM Company thereupon changed its name to Shields Development Company (i.e., New Shields). The shares of New Shields are, of course, owned by the same persons and in the same proportions as were the shares of Old Shields. On July 19, 1984, the majority shareholders entered into a new agreement governing transfer of their shares. That agreement permits a

ginia S. Shields). Indeed whether Virginia's stock is subject to the restrictions imposed is

warmly contested. It is unnecessary at this juncture for me to delve into these points.

redemption only at fair market value and is available to all shareholders who chose to sign it.

On October 2, 1984, John Shields and his wife acting individually and as trustee for her children gave notice to Daniel Shields and to his wife individually and as trustee for her children of an election to exercise rights under the 1966 Agreement to buy their stock in Old Shields at book value. The assertion of such a right is predicated upon the legal position that the merger constituted a sale or disposal of the Daniel Shields family stock which—under paragraph 2 of the 1966 Agreement—gave rise to a preliminary right on the part of other signatories to that Agreement to purchase the Daniel Shields family stock at book value.

John Shields tendered a check for what he regarded as the requisite purchase price. Not surprisingly Daniel Shields returned the check and declined to deliver any shares of stock to John. As a countermove, the various Daniel Shields related interests promptly purported to exercise their rights under the 1966 Agreement to buy the stock of the various John Shields related interests on the same theory. This lawsuit was instituted on November 5, 1984 seeking, among other things, an order requiring the Daniel Shields family to convey their stock in Old Shields to his brother and his family.

Plans to sell the assets of Old Shields and distribute the proceeds to all shareholders proceeded in the new corporate entity. On January 31, 1985, the Board of Directors of New Shields adopted a plan of complete liquidation and a majority of record shareholders approved that action by written consent on February 7, 1985. Pursuant to that plan, and after receiving a report on the appraisal value of its real estate holdings, New Shields entered into a contract for the sale of such holdings for a cash price of $4,180,000. Daniel Shields has offered to sell his stock in New Shields to John Shields at a price based upon this value. John Shields has not accepted that offer. Instead he and the members of his immediate family seek to press their claims under the 1966 Agreement to that stock and by this motion seek preliminarily to enjoin that sale.

## II

■ The standards that govern the issuance of a preliminary injunction are well developed and require no elaborate restatement. Essentially this remedy will not issue unless the applicant satisfies the Court that there is a reasonable probability that he or she will ultimately prevail at final hearing on the claims asserted; that unless the remedy is afforded to maintain the status quo until a final hearing can be had, applicant will be injured in a way that is not repairable by an award of damages; and that this threat of irreparable injury to applicant outweighs the threat to defendants of injury that might arise from being wrongfully restrained. See, *Gimbel v. Signal Companies, Inc.*, Del.Ch., 316 A.2d 599 (1974) *aff'd* Del.Supr., 316 A.2d 619 (1974). Any interest that the public may have in the granting or denial of a preliminary injunction should also be considered in the determination of the granting or withholding of this remedy.

■ In applying these standards to the matter before me I find myself unable to conclude that the entry of the order sought is justified in the circumstances as they appear to be at this stage.

I need not focus finely on plaintiffs' claims of irreparable injury in this instance as I have concluded that plaintiffs have failed to demonstrate a reasonable probability of success at trial. Indeed, for reasons only some of which I now take the time to set forth, my view at this stage is that plaintiffs' claims as presently constituted are unlikely to be vindicated at final hearing.

## III

The central legal issues presented by this motion are (1) whether the conversion of

shares effectuated by the merger of Old Shields into New Shields constituted a transfer or disposition of Old Shields shares that gave rise to rights of first refusal on the part of signatories to the 1966 Agreement and (2) whether plaintiffs have a right to have that merger rescinded since it appears to have been effectuated for the sole or principal purpose of nullifying the effect of 1966 Agreement and for no other corporate purpose. If the answer to each of these questions is in the negative—as for the reasons that follow I hold them to be—then there is no basis for this Court to restrain the proposed sale of New Shields' assets, as that sale would otherwise appear to have been duly authorized by the action of a majority of the shareholders of New Shields entitled legally and equitably to vote to approve or reject that transaction.[5]

Plaintiffs claim that the "exchange" by Daniel Shields of his stock in Old Shields for stock in New Shields pursuant to the merger gives rise to a right in John Shields to buy Daniel's stock at book value. This claim rests upon the following provision of the 1966 Agreement:

> (2) In the event any party desires to sell, give, pledge, dispose of by will, gift in trust or in any manner otherwise dispose of his or her stock holdings in the Company (not having received a bona fide offer to purchase the same), before any such party shall transfer all or any part of his or her such stock holdings to any person for any reason whatever, such stock holdings shall first be offered to the other parties to this agreement, first

jointly and then severally, which remaining parties shall have the right and option, exercisable in writing within thirty (30) days from the date of such offer to purchase such stock holdings at a price per share determined by the book value of such stock at the close of the last calendar year preceding the date of offer of the party so desiring to dispose of his or her said stock holdings.

The argument in support of this claim fundamentally misunderstands relevant aspects of Delaware corporation law upon which it critically rests.

■ The statutory conversion of stock in a constitutent corporation into stock in the surviving corporation that is effected by a stock for stock merger ought not be construed to constitute a sale, transfer or exchange of that stock for purposes of an agreement among shareholders restricting their power to transfer their stock. *Cf., Union Chemical & Materials Corp. v. Cannon,* Del.Supr., 148 A.2d 348, 352 (1959) ("... conversion of shares by merger is not a transfer or assignment.") *Silversmiths Co. v. Reed & Barton Corp.,* 199 Mass. 371, 85 N.E. 433 (1908). A merger between or among Delaware corporations is not a stockholders act of the kind the 1966 Agreement sought to restrict; it is a corporate act, albeit one requiring for its effectuation the approval of a majority of the shareholders of the corporation. When duly effectuated, such a corporate act effects by operation of law a transmutation of the stock interest in a constituent corporation. 8 *Del.C.* § 251.

---

5. For the sake of clarity I note that it is not a necessary point of my holding that the effectuation of the merger, or more accurately Daniel Shields' approval of it *qua* shareholder, did not constitute a breach of any express or implied term of the 1966 Agreement. It may be—although I express no opinion on the subject now—that approval of the merger in these circumstances constituted a violation of an implied term of good faith that requires each party to a contract not to take any voluntary action designed to deprive another party of the benefits of his contract. Even were that the case, however, it is difficult to imagine that damages

could be shown to flow from any such breach here where plaintiffs concede, as they must, that the majority shareholders had the right to liquidate Old Shields in all events and where the majority had taken steps to do so. In such circumstances even were such a breach found, it seems likely that only nominal damages could be awarded. Nor need I on this motion decide whether an appropriate remedy for any such breach would include the exercise of equitable power to impress upon the shares of the surviving or resulting corporation the restrictions on transfer arising from the stockholders agreement.

At the moment a stock for stock merger is effective, the stock in a constituent corporation (other than the surviving corporation) ceases to exist legally. The subject matter of the stockholders' agreement thus vanishes, so to speak, at that point and its place is taken by a stock interest in another, distinct corporation. The merger accomplishes that result and necessarily legally moots the terms of a restriction on transfer of the stock of a disappearing corporation. Whether that effect is one that is valid is to be tested by the provisions of the corporation law governing mergers, and in appropriate cases by the fiduciary standards imposed upon directors and controlling shareholders, and not by the provisions of an agreement between shareholders of the corporation. *Orzeck v. Englehart*, Del.Ch., 192 A.2d 36 (1963) *aff'd* Del.Supr., 195 A.2d 375 (1963); *Langfelder v. Universal Laboratories, Inc.*, D.Del., 68 F.Supp. 209 (1946) *aff'd* 3rd Cir., 163 F.2d 804 (1947).

The fact that a merger may have the effect of eliminating a class of corporate securities and thus legally mooting an unexercised power with respect to such securities is neither shocking nor novel. *Federal United Corporation v. Havender*, Del.Supr., 11 A.2d 331 (1940) established in our law that mergers may affect "vested" rights, such as the right in that case of preferred stockholders to receive unpaid accumulated dividends. In *Langfelder v. Universal Laboratories, supra*, a merger, the validity and fairness of which had been resolved by this Court, was held to have been effective to negate a contractual undertaking by a constituent corporation to pay cash to holders of preferred shares as a condition to a recapitalization. The Court said:

> If, under the Delaware cases, the effect of an otherwise valid merger under Sec. 59 [now § 251] is to abolish a debt, i.e. accrued and unpaid dividends, then it would seem that the *Havender* doctrine would countenance the abolishment of a simple contract right." 68 F.Supp. at 212.

Here the effect of the merger was not so much the abolishment of a contract right but the mooting of it, since as a result of the merger the stock to which the right related disappeared by operation of law. But this legal effect of a merger does not in my opinion mean, as plaintiffs here argue, that the merger must be regarded as a disposition of stock within the terms of an agreement restricting free transfer of such stock.

Agreements between stockholders with respect to their stock may, of course, take any number of forms, see 8 *Del.C.* § 202, and it is conceivable that such an agreement could provide that in the event of a merger resulting in the signatories holding shares of another corporation that certain consequences would occur, including the forced sale by one party of the *new* stock to another party at an agreed upon price or a price fixed by reference to an agreed upon formula. That the 1966 Agreement may not be read in such a way, however, is evidenced first by the anomaly it would present of providing, under the circumstance of a stock for stock merger, a right in each party to buy out the substantially equal stock interest of the other[6] and second by the anomaly that both would have a right to buy that which has ceased to exist

---

**6.** The fact that John Shields has not submitted the stock certificates representing his former interest in Old Shields in exchange for certificates in New Shields does not affect this analysis. *See Joseph E. Seagram & Sons v. Conoco, Inc.*, D.Del. 519 F.Supp. 506, 513 (1981). Section 251(b)(4) of the Delaware General Corporation Law provides that a merger agreement shall state "the manner of converting the shares of each of the constituent corporations into shares ... of the corporation surviving ... the merger". Paragraph SEVENTH of the Agreement and Plan of Merger provides in part as follows:

> B. Each share ... of stock of [Old] Shields that is outstanding on the effective date of the Merger and all rights in respect of those shares, shall by virtue of the Merger and without any action of any holder of those shares be converted into one share ... of stock of the Surviving Corporation.

by virtue of the act (i.e., the merger) giving rise to the right.

Plaintiffs' authorities do not strike me as apt in these circumstances. *McCarthy v. Osborn*, 223 La. 305, 65 So.2d 776 (1953), the authority upon which plaintiffs place their heaviest reliance, deals with a cash-out merger apparently effectuated as an alternative to a sale of substantial share-holdings in the disappearing corporation. A sale of shares itself was precluded in that instance by a right of first refusal conferred on other shareholders by the certificate of incorporation. Plaintiff, a shareholder, alleged that the "so-called merger" was a fraudulent device used to deprive her of her right to participate in the company and of her rights of first refusal. She sought money damages. The trial court dismissed the complaint; the Supreme Court reversed holding that the "so-called merger" was not a merger recognized by Louisiana law since it did not provide for the continuation by the plaintiff of a stock interest in the surviving corporation. It also held that a supplemental petition should be permitted to be filed that would more fully show the fraud of which plaintiff complained and that the case should be permitted to proceed to trial. Insofar as *McCarthy* may be read to hold that a merger may give rise to a claim for money damages arising from corporate action designed to side-step a right of first refusal, it is not apposite to the pending motion which seeks preliminarily to restrain planned corporate action. See Fn. 5 at p. 167, *supra*. More fundamentally, to the extent *McCarthy* may be read as authority for the notion that an authorized corporate act (e.g., a merger) may be tested by the legal standards applicable to a form of corporate transaction that has the same economic effect (e.g., a sale of stock or a sale of assets), it is inconsistent with the established line of Delaware cases referred to above that squarely stand for the reverse of that proposition.

*Thompson v. Anderson*, 209 Kan. 547, 498 P.2d 1 (1972), another authority relied upon by plaintiffs in this connection, provides no assistance to them in meeting the burdens assumed by this motion. That case simply holds that plaintiff waived rights under a stock transfer restriction agreement by a course of conduct including the adoption of prior litigation positions and a stock merger involving the issuing corporation. The waiver principle of *Thompson* is of no analytical significance for this case.

▮▮▮ Thus, I find no reasonable probability that plaintiffs are likely to prevail ultimately on their claim that the conversion of stock effectuated by the merger of Old Shields into New Shields constituted a disposition of the Old Shields stock in violation of the terms of the 1966 Agreement. That conclusion, however, does not conclude an analysis of plaintiffs' positions with respect to the probability of success issue. Plaintiffs contend that the merger itself has no valid purpose and indeed is a sham transaction accomplished for the benefit of defendants alone. The accomplishment of the merger, plaintiffs assert, constitutes a breach of the fiduciary duty that defendants as majority shareholders owe to plaintiffs. They seek, in Count IV of the Complaint in this action, to have the merger rescinded.

Since the claim asserted to the defendants' stock is predicated upon the merger, the rescission of the merger would presumably moot plaintiffs' claim to the stock and leave the parties where they were prior to the merger. That would leave the majority free to approve the sale of the assets of Old Shields and to distribute the proceeds in liquidation. Thus one is free to wonder if the relief requested in Count IV is really meaningful to plaintiffs. I suppose the answer is that when one is engaged in a stone fight one picks up to throw whatever is close at hand.

In any case since the argument is pressed I have considered it. For purposes of this motion I have assumed that the merger of Old Shields into New Shields had no purpose other than freeing the stock of

the Shields family from the lottery effect created by the 1966 Agreement. I take it also for these purposes that it is not altogether clear what stock of Old Shields was subject to the terms of the 1966 Agreement and what stock, if any, was free from those restrictions.[7]

I do not regard it as an unreasonable position in these circumstances for the board of directors of Old Shields to take steps to free the stock of all the shareholders from the lottery effect that the 1966 Agreement imposes on many and, perhaps, all of the shares of the corporation. In recommending the merger for that purpose, the board, i.e., Daniel Shields, was not engaging in a self-dealing transaction as the Delaware law has defined that term because while Daniel Shields, as a stockholder, would benefit from the effectuation of the merger, he would not do so in a way different from other shareholders or to the detriment of the corporation. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984). The fact that one shareholder would prefer to run the risk and seek the potential reward that the lottery effect of the 1966 Agreement offered does not in any sense obligate the board of directors to honor that wish if, in its judgment, the best interests of the shareholders as a whole would be served by action inconsistent with that desire. *Cf., Unocal Corporation v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985). Thus, I find no reasonable probability that plaintiffs will ultimately prevail on a claim that the merger itself constituted violation of fiduciary duties and should be rescinded.

Finally, I should address the question of balancing of the equities, because it is something I have considered in reaching my judgment. A number of facts that are undisputed on the current record seem to me particularly important in assessing the overall equities of this situation. First, it is uncontested that the assets of Old Shields, now owned by New Shields, have a current fair market value in excess of $4 million. Secondly, it is agreed that the book value of those assets is currently approximately $250,000.00. Thirdly, both of the principal antagonists in this action have agreed that it is no longer in their best interests or the best interests of the company for them to continue indefinitely jointly managing the family enterprises. Fourthly, it is conceded that Daniel Shields has offered to sell his interests to John Shields at a price that represents the proportionate share of the fair market value of the company's assets that might be realized through the sale that is now sought to be enjoined. John Shields is apparently unwilling or unable to agree to such a purchase. Finally, it is conceded by plaintiffs that the adoption of a plan calling for the sale of all the assets of Old Shields and the liquidation of that company, which was done in 1984 by majority vote, did not constitute any arguable violation of any right of his.

The merger, however, intervened, plaintiffs would say, and created rights in them to stop the liquidation and acquire the stock at bargain prices. Were I persuaded that the technical argument advanced for this purpose was correct, these facts would cause me to think long and hard as to whether a court of equity should intervene on behalf of plaintiffs. Having concluded, however, that the technical arguments advanced are not likely to sustain the close scrutiny of final hearing, my duty in these circumstances involves no such troubling decision.

Plaintiff's application for preliminary injunction shall be denied.

---

7. Virginia S. Shields has, in this litigation, taken the position that her stock, bequeathed to her by her late husband is free from such restriction. Plaintiffs in this proceeding have taken a similar position, defendants the reverse position. Plaintiffs, however, have been unwilling to take the position that the stock transferred by Daniel Shields to his wife and to his wife in trust for his children in 1976 and 1977 would not be subject to the restrictions of the 1966 Agreement and their October 2, 1984, "exercise" letter and this lawsuit evidences a view that the shares so transferred were subject to the terms of that Agreement.