**Jeffrey COUCH, Susan Couch Rutkoske, Felix Rutkoske, and Irene Rutkoske, Petitioners,**

**v.**

**DELMARVA POWER & LIGHT COMPANY, and the Delaware Department of Transportation, an agency of the State of Delaware, Respondents.**

Court of Chancery of Delaware, New Castle County.

Submitted: March 11, 1991.
Decided: March 20, 1991.

Daniel J. Anker, Wilmington, for petitioners.

Somers S. Price, Jr., and Frederick H. Altergott of Potter Anderson & Corroon, Wilmington, for respondent Delmarva Power & Light Co.

Frederick H. Schranck, Deputy Atty. Gen., Dover, for respondent Delaware Dept. of Transp.

## OPINION

ALLEN, Chancellor.

Delmarva Power & Light Company ("DP & L") is presently installing a new 25 kilovolt electrical transmission line along the easterly side of Route 10 in Appoquinimink Hundred, New Castle County. This work is supposedly being done within the State of Delaware highway right of way with the approval of the Delaware Department of Transportation ("DelDOT"). Plaintiffs own about 170 acres of farmland bordering the easterly side of Route 10. They bring this action against both DP & L and DelDOT seeking an order requiring DP & L to halt such installation and to remove the poles and wires it has already installed.

Plaintiffs assert several theories in support of the relief they request. First, they contend that DelDOT's grant of the franchise permitting this work is invalid because the Department did not, in considering that matter, take into consideration the mandated state policy of fostering and protecting farmland. *See* Agricultural Lands Preservation Act, 3 *Del.C.* § 901, *et seq.* ("the Act" or "ALPA").

Second, plaintiffs assert that DP & L is installing these facilities not in the DelDOT right of way but on their property. Thus, they claim DP & L's action constitutes a simple continuing trespass warranting injunctive relief.

Third, plaintiffs claim that the 25kv electrical transmission line that DP & L is in the process of installing will interfere unreasonably with the use of their land; that is, that it is a nuisance. In particular plaintiffs assert that the 25kv lines in question will create electromagnetic fields that will be of the low-level non-ionizing type. These electromagnetic fields are not regulated by any governmental agency. Their effects, plaintiffs say may be linked "to birth defects and higher incidents of cancer" although plaintiffs admit that the evidence on this is "inconclusive." Whatever the risks, plaintiffs contend, it is not reasonable that their farmland be subjected to them.

Finally, plaintiffs contend that DP & L's franchise should be declared void and action pursuant to it enjoined because DelDOT could not reasonably find, as its regulations required it to find in this instance, that to deny the franchise request would constitute an extreme hardship. Thus, plaintiffs assert that DelDOT actions were in violation of its own regulation, arbitrary and consequently legally void.

\* \* \*

This action was commenced with an application for a temporary restraining order. That application was denied on February 22, 1991, and the matter was set down for a prompt hearing of a motion for preliminary injunction. It is that motion that is now pending.

At the conclusion of the presentation of the application, preliminary injunctive relief was denied with respect to plaintiffs' continuing trespass theory and their nuisance theory. With respect to both of those matters, any evaluation of the right to relief would require a clearer sense of underlying facts than the presently conflicting record would now permit. Thus, judicial action with respect to these theories must necessarily await trial. What remains for present consideration is an evaluation of plaintiffs' two remaining theories which are not so thoroughly factual in nature.

## I.

A sketch of the background facts will orient a discussion of these issues. Increased growth in lower New Castle County has required DP & L to upgrade and modify its present infrastructure in order to continue to assure consistent and reliable service in that region. The existing Townsend circuit is presently capable of meeting normal demand; however, in the event of the failure of an adjacent circuit, that circuit lacks the capacity to serve additional customer requirements that are emerging as a result of increased development. In 1988, DP & L had identified this as a potential problem and sought to alleviate it via interim measures such as replacing reclosers. Ultimately, these alternatives were exhausted, yet the outage level in southern New Castle County apparently remains at 3–½ times that of the average DP & L customer.

As part of a larger plan to resolve outage problems in the Middletown, Odessa and Townsend areas, DP & L decided to upgrade its transmission lines along Route 10 (also known as Levels Road). Levels Road presently has a 69kv transmission line running along its western side. It appeared to DP & L to be uneconomical to utilize this existing line, however, because to do so would require the replacement of the existing poles with taller and thicker poles spaced at more frequent intervals in order to accommodate the increased weight of the new cables and to maintain vertical clearance between them and the existing lines. DP & L estimated that the cost of this alternative would be $950,328. DP & L also rejected the alternative of running the new lines underground because it would have involved more intrusive construction, longer outages as problems would be more difficult to locate, and significant additional expense. Installing the circuit underground would cost $769,672 plus an additional $16,000 to install a switch every time a new customer was added.

DP & L determined that the most feasible and flexible alternative would be to run another line along the easterly side of Route 10. Running a new line along the easterly side of the road would cost $112,-779. This plan, however, presented a problem with respect to DelDOT regulations. Section 18(a)(1) of the DelDOT Division of Highways Utility Manual provides:

A utility will not be issued a franchise or utility construction permit to place their facilities on both sides of a travelway, *except in cases of extreme hardship.* In cases of extreme hardship, a written request and justification shall be submitted to the District Engineer for his action.

(emphasis added).

On October 10, 1990, DP & L formally applied to the District Engineer for a franchise. On November 14, 1990, citing its "hardship" regulation, DelDOT requested additional documents and supplemental information that might justify extending a hardship exception. On November 21, 1990, DP & L provided DelDOT with additional information detailing the cost of alternatives. It contended that other alternatives had non-finance drawbacks, *e.g.,* less flexibility and longer outages; and explained that the proposed project was the last in an integrated three-prong approach to improve service in southern New Castle County. It also indicated that the existing lines and poles were scheduled to be removed around 2004.

On November 30, 1990, DelDOT indicated it would grant the hardship request only subject to four conditions:

1) The existing transmission line on Levels Road was to be removed by 2004.

2) The new line was to be with vertical construction and no crossarms and within one foot of the easterly edge of the right of way.

3) Additional spacing was required to decrease the number of poles.[1]

4) No roadside guy wires were to be permitted.

On December 10, 1990, DelDOT granted DP & L the franchise, and on January 3, 1991, construction commenced in and around the right of way adjacent to plaintiffs' property.[2]

On January 31, 1991, the Department of Agriculture, apparently on the instigation of plaintiffs, advised DelDOT of concerns regarding the Department's action in light of the terms of the Agricultural Lands Preservation Act. DelDOT responded on February 7, 1991, that the statute was not relevant because the land at issue was owned by DelDOT and hence was not, in its view, farmland within the meaning of the Act. On February 14, 1991, the Department of Agriculture's Division of Resource Management informed plaintiffs of its conclusion that DelDOT "did not exceed the scope of its authority in granting the franchise," and that "the Department [of Transportation] arrived at its decision after an adequate finding of public need as required by the Agricultural Lands Preservation Act of 1981."

This suit was commenced on February 21, 1991.

## II.

The test for the granting of a preliminary injunction is well settled. First, one seeking the injunctive relief must establish a reasonable likelihood of success on the merits of their claims. Second, the court must be persuaded that failure to grant the relief sought will result in injury that will not be remediable by later injunctive relief or compensable by an award of damages. Finally, the Court must evaluate the chance that the defendants (or other persons) will be injured by the improvident granting of the relief sought and whether any injury of that kind could itself be remedied later. In sum, the Court must weigh and balance all of the equities. *See, e.g., Ivanhoe Partners v. Newmont Mining,* Del.Supr., 535 A.2d 1334 (1987); *Shields v. Shields,* Del. Ch., 498 A.2d 161 (1985). In this instance, it is an evaluation of the probable merits of the claims asserted that is decisive of this motion.

## III.

■ Plaintiffs' first theory is that DelDOT's action in granting permission to DP & L to install the new 25kv line along the easterly side of its Rt. 10 right of way is invalid because that action did not comply with the terms of the Agricultural Lands Preservation Act. For the reasons that follow, I conclude that ALPA creates no rights enforceable by members of the public, and thus, it presents no basis upon which the relief sought could be granted.

The language of the statute itself is, of course, the first and most authoritative source of any judgment on this question. ALPA is not lengthy. It begins with a legislative finding that (a) the loss of Delaware farmlands "threatens our national economic and social interests" (3 *Del.C.* § 902(a)) and that "maintenance of a viable agricultural base requires the protection and preservation of those areas best suited for agricultural production." 3 *Del.C.* § 902(b).

The Act then states (Section 903) that:

(1) It shall be state policy that:

\*   \*   \*   \*   \*   \*

c. Public actions which adversely impact agriculture shall be avoided without an ample finding of public need; and

\*   \*   \*   \*   \*   \*

(2) It shall be state policy to conserve, protect and enhance the States agricultural economic base ... and to pre-

---

1. DelDOT abandoned this condition after DP & L explained that it was not possible to decrease the number of poles given the requirement of vertical construction with no crossarms.

2. Construction is now in fact completed. All that remains is to energize the wires.

serve these resources for their natural and ecological values....

Section 904 of Title 3, as amended, creates "Duties and responsibilities" under the Act:

(a) The Department of Agriculture shall carry out the policies set forth in this chapter.

(b) The Department of Agriculture shall identify and map those farmlands which, because of their soil type (etc.) ... are of concern to preservation....

(c) The Department of Agriculture shall review the data [it has] collected and recommend techniques to maintain agriculture. The Department of Agriculture shall assist other public agencies in the development of facility plans and programs in order to minimize adverse impacts on agriculture.

(d) All other state departments and agencies shall, to the maximum extent permissible under state law, cooperate with the Department of Agriculture in carrying out the state policies and the maintenance and preservation of agricultural activities.

\*     \*     \*     \*     \*     \*

Section 905 requires annual reports to the Governor, the General Assembly, and the Governor's Council on Agriculture as to the extent, location and causes of farmland loss.

Under Section 906, the Secretary of the Department of Agriculture "may establish and promulgate such rules ... as he deems necessary to enforce the state policy established in Section 903...." He may hold hearings, "whenever [he] ... has reason to believe that a public agency's action will have an adverse impact on agriculture without an ample finding of public need .... and [may] make recommendations ... to the public agency."

Finally, if the public agency involved "disagrees with the Secretary's recommendation, the Secretary may request the Attorney General to review the record on the [Section 906] hearing on the matter and determine whether a Chancery Court action for injunctive relief consistent with this chapter is warranted."

\*     \*     \*

Plaintiffs' argument here is that, in granting permission to DP & L to construct the new 25kv line, DelDOT did "adversely impact agriculture" [Section 903(1)(c)] since that new line will interfere with their farming of a strip of state right of way land [3] several feet in width and about one mile in length and that there is no "ample finding of public need" (*id.*) justifying that impact. Thus, they assert that the action is in violation of declared "state policy" and should be voided by this Court.

The most basic question this theory raises is whether ALPA creates any right in plaintiffs of any kind whatsoever, or more specifically, a right to secure judicial review of the consistency between DelDOT's action and the duties imposed by ALPA. The Act does not explicitly create a private right of action to attack state administrative action as invalid. Nor does the Administrative Procedures Act, 29 *Del.C.* § 10101, *et seq.* DelDOT is not an agency whose actions are subject to that Act. *See* 29 *Del.C.* § 10161. Thus, the question that this case poses is whether ALPA creates a private right of judicial review by implication. The test that has been followed in this jurisdiction for making such a determination is described by the United States Supreme Court in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). *See Lock v. Schreppler,* Del.Super., 426 A.2d 856, 864–867 (1981); *Paul v. Board of Education,* Del.Ch., C.A. No. 7335, Berger, V.C., 1984 WL 21872 (Dec. 21, 1984). That test involves a three part inquiry:

(1) Is plaintiff a member of a class for whose special benefit the statute was enacted;

(2) Is there any indication of legislative intent to create or to deny a private remedy for violation of the act; and

---

**3.** I do not here consider the question whether DP & L's new poles are in fact on plaintiffs' land. As indicated above, that question must be tried.

(3) If there is no such indication, would the recognition of an implied right of action advance the purposes of the act?

For the reasons set forth below, I am forced to the conclusion that ALPA confers no right on plaintiffs, or on any other private party, to litigate the question whether state administrative action "adversely impacts agriculture" or, if it does, whether any justification for such impact is or is not "ample." The statute is a reasonably precise administrative directive aimed at the internal operation of the departments and agencies of state government. It orients the Department of Agriculture as to policy with respect to farmland preservation; it directs the Department to collect data and make recommendations and reports. It provides that rules may be promulgated and, at the discretion of the Secretary, a hearing held.[4] Finally, it provides a framework for a sort of administrative mediation with final resort to the Court of Chancery with the concurrence of the Attorney General.

All of this is quite specific and targeted. It would, in my opinion, constitute a gross intrusion into the narrow purpose of this statute to infer that private citizens were implicitly granted rights by this statute to bring actions directly for judicial review of administrative actions alleged to violate the statement of policy contained in Section 903 of the Act.

ALPA is quite different than the Public Service Commission Act involved in *Smith v. Delaware Coach Co.*, Del.Ch., 70 A.2d 257 (1949) upon which plaintiffs importantly rely. In that case, this court held that members of the public did have standing to test the validity of Public Service Commission approval of a new tariff for bus transport, even though the statute expressly conferred standing only upon "the Attorney General, or any public utility affected [by an order of the Public Service Commission]" to "appeal" decisions of the Public Service Commission to the Superior Court. The Chancellor implicitly found that the public notice and mandatory hearing provisions of the statute reflected a legislative

intent to confer rights on the public (*e.g.*, 70 A.2d at 160). The request for an injunction and the absence of an exclusive alternative forum were deemed sufficient to sustain Chancery jurisdiction.

While *Smith* was not analyzed in terms of the later *Cort v. Ash* tests, focusing on these tests highlights the differences between that case and this one. In *Smith*, the Public Service Commission regulation of bus fares was plainly intended for the benefit of the bus-riding public, who otherwise would be subject to risks of opportunistic pricing by a licensed monopolist. In this case, however, the record gathering, reporting and conflict resolution mechanisms created by the Agricultural Lands Preservation Act appear to be aimed at the achievement of public policy objectives of general and indirect benefit to all citizens. Further, while the Public Service Commission Act in *Smith* arguably implied a private remedy in its requirement of public notice and public hearing, at no point does ALPA contemplate public notice or public participation in decisions by the Secretary of the Department of Agriculture with respect to the policy of the Act.

Thus, I conclude that in invoking the authority of *Smith v. Delaware Coach Co.*, plaintiffs call upon an inapt precedent. In addition to *Smith*, plaintiffs assert the authority of *Tate v. Miles*, Del.Supr., 503 A.2d 187 (1986), but it too is different in a very material way from this case. *Tate* involved a Court of Chancery challenge to the validity of a Sussex County ordinance amending the zoning of only two lots in a subdivision. It is an important precedent here, plaintiffs say, because there was no statute granting neighbors, who were arguably affected by a close-by zoning change, standing to challenge the validity of the ordinance. Yet this Court and the Supreme Court on appeal undertook to consider plaintiffs' claim and to strike down the ordinance. An even clearer authority for this point would be *Green v. County Council*, Del.Ch., 508 A.2d 882, *aff'd*, 516 A.2d 480 (1986). Plaintiffs claim that the analogy between themselves and the affected landowners in *Tate*

---

4. There is no duty to promulgate rules nor any    duty to hold hearings.

v. *Miles* (or *Green*) is close. They too claim that government action is inconsistent with a governing statute (chapter 69 of Title 9 in the zoning cases, ALPA here) and that in fact they are harmed by that action. They too seek injunctive relief.

The defect in this parallel, however, rests in the conclusion reached here (but not in those cases) that the statutory scheme cannot be read to imply a private right of action. In the zoning cases—as in *Smith* 35 years earlier—the statutory requirement of public notice and public hearings render it plausible to conclude, as the zoning cases regularly do,[5] that private persons have cognizable interests in zoning changes that substantially affect their property. But ALPA's absence of any requirement for public notice or public hearings render a similar conclusion untenable. ALPA is not, like the zoning statute in *Tate* or the Public Service Commission statute in *Smith*, a regulatory statute affecting the interests of specific classes of persons. It is a statute concerned with the internal administration of government. One cannot conclude, as could be done in those cited cases, that applications of the test of *Cort v. Ash* would allow the recognition of an implied cause of action under ALPA.

### IV.

Plaintiffs' second theory is in some ways related to the foregoing. As I understand that theory, it is as follows. The regulations of DelDOT require that only upon a showing of extreme hardship will the Department deviate from its usual rule that restricts utility poles to one side of a right of way. Here there was insufficient evidence for DelDOT rationally to conclude that refusal of the exception would result in extreme hardship. Thus, its action was beyond its rules, arbitrary and unlawful. As those particularly impacted by this action, plaintiffs assert they have standing to litigate this claim.

### A.

DP & L disagrees with each aspect of this assertion. But most particularly, it disagrees with plaintiffs' assertion of a right to litigate this claim. It points out that DelDOT is excluded from the coverage of the Administrative Procedures Act, which does afford a mechanism for affected parties to challenge administrative action, and thus, one must conclude that the General Assembly has implicitly declined to create a right of judicial review of the type now sought. Rather, DP & L claims that the only remedy available to plaintiffs is the limited legal remedy of certiorari. On this point I must dissent.

It seems to me very dubious that judicial review of DelDOT's grant of franchise is available through the common law writ of certiorari. Unless modified by statute, that procedure contemplates review by a superior court of proceeding in an inferior court. It has now been expanded to include review of administrative actions when taken on a record. In either event it generally[6] contemplates only a review of the paper record created below to determine whether the lower court or agency has made an evident error of law. *See generally*, 16 Wright, Miller, Cooper & Gressman, *Federal Practice and Procedure: Jurisdiction* § 4005 (1977). The agency action here involved, however, was not made pursuant to a quasi-judicial hearing and order procedure. It was a routine decision by an operating officer of the De-

---

5. *See* 4 Anderson *American Law of Zoning* § 29.11, at 662–664 (3d ed. 1986) ("... actions commenced by private persons to enjoin violation of the zoning ordinance are an important part of the enforcement program [and] are more numerous than those commenced by taxpayers or municipalities...."); *see also Reynolds v. Soffer*, 183 Conn. 67, 438 A.2d 1163 (1981) (any person specifically and materially damaged by a violation of a zoning ordinance has standing to seek injunctive relief).

6. In some areas the procedure triggered by the common law certiorari writ has been modified to allow discovery of facts and taking of evidence. *See, e.g.*, Section 4918 of Title 9 (allowing for Superior Court review of decision of Kent County Board of Adjustment by writ of certiorari but also allowing for evidence beyond the record below).

partment. There is no "record" of this action, other than the franchise itself, for the common-law writ to act upon. In such circumstances, there may be substantial doubt that the writ of certiorari is meaningfully available. *Cf. Garden Court Apartments v. Hartnett*, Del.Super., 65 A.2d 231, 234 (1949). But I need not decide whether the Superior Court might entertain an application for review of DelDOT's action by certiorari, for in no event would the availability of such review deprive this Court of jurisdiction to adjudicate plaintiffs' claim, to the extent they allege a claim. For the reasons delineated above, even if the writ were here available, the common law writ of certiorari would not constitute an adequate legal remedy in these circumstances. 10 *Del.C.* § 342 (1975).

Thus, I conclude that defendants' jurisdictional arguments are faulty. But do plaintiffs have any legitimate claims arising from the DelDOT action? Plainly the General Assembly did not expressly (or otherwise as it appears) create rights in owners of land adjoining a right of way to achieve judicial review of DelDOT action concerning such right of way. But the statutes of our state, while the principle source of legal rights, are not the only source of rights. Both the common law and our federal and state constitutions create enforceable rights as well. Most pertinently, it has long been recognized that administrative arms of government are bound by the federal constitution to abide by their own rules and regulations. *See, e.g., U.S. v. Nixon,* 418 U.S. 683, 694–96, 94 S.Ct. 3090, 3100–02, 41 L.Ed.2d 1039 (1974); *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). When the government violates its own rules, without a justifying emergency, persons who are adversely affected by that action

have avenue of relief.[7] *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1165, 1 L.Ed.2d 1403 (1957). Such an action arises directly from the Fourteenth Amendment to the United States Constitution and from Section 9 of Article 1 of the Delaware Constitution (1897).

### B.

I therefore assume for purposes of this motion, without deciding, that the amended complaint does in this respect state a claim upon which relief may be granted. I cannot conclude, however, that plaintiffs have established a reasonable probability of establishing that, in fact, the action of DelDOT was arbitrary; was motivated by an impermissible consideration;[8] or was otherwise a violation of plaintiffs' rights to due process of law.

Plaintiffs ultimately seek judicial relief that would require public notice and the convening of a DelDOT hearing on the question whether DP & L can demonstrate that application of the general department practice or rule prohibiting the installation of electrical transmission lines on both sides of a state road right of way would constitute an extreme hardship. It does not appear, however, that a legal requirement for notice and a hearing exists in the Delaware statutes or arises from our federal or state constitutions. It was noted above that DelDOT is specifically exempted from the terms of the Administrative Procedures Act, 29 *Del.C.* § 10161. While the constitution itself will give rise to a right to prior notice and hearing when a protected interest of a person is directly and purposefully affected by state action,[9] the constitution does not require notice and hearing where the exercise of property rights by the state may have indirect effects upon

---

**7.** This statement takes no account of the availability or not of defenses such as sovereign immunity. *George & Lynch, Inc. v. State,* Del. Supr., 197 A.2d 734 (1964).

**8.** An inappropriate motivation may in some instances invalidate governmental action. For example, state action that is otherwise lawful will be found to be invalid and may be enjoined where it is proven to constitute retaliation for

the exercise of first amendment, *e.g., Thompson v. Bass,* 616 F.2d 1259, 1264 (5th Cir.) *cert. denied sub nom., Thompson v. Turner,* 449 U.S. 983, 101 S.Ct. 399, 66 L.Ed.2d 245 (1980).

**9.** *See, e.g., Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

others. *See New Haven v. United Illuminating Co. Inc.*, 168 Conn. 478, 362 A.2d 785, 793 (1975).

Such action does not entail the exercise of sovereign power. As may any property owner the state may, in conformity with applicable statutes and regulations, grant interests in or utilize its property. That a neighbor may be adversely affected may give rise to a cause of action for nuisance. It may also give rise to a claim of inverse condemnation. But I am aware of no case holding that the constitution requires that such an impact, or the threat of such an impact, creates an obligation on the part of the state as property owner to act only after notice and hearing, and the notion seems incorrect in principle.

■ Turning to other possible bases for a claim that the DelDOT grant constitutes a violation of rights of plaintiffs, I note that plaintiffs do not suggest any inappropriate motivation. But they do contend that there is no basis upon which DelDOT could conclude that denial of the DP & L request would constitute an "extreme hardship" as is required by DelDOT regulations. In assessing the agency's conformity with its regulations, I note that it is basic that courts should defer to judgments of an administrative agency as to the meaning or requirements of its own rules, where those rules require interpretation or are ambiguous. *Bowles v. Seminole Rock Co.*, 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). Thus, in my judgment, where an administrative agency determines that extreme hardship is present and a court is charged to review that determination in an action arising directly from the federal or state constitution, it may strike down the administrative action only upon a conclusion that no rational person could, under any responsible interpretation of the regulation (*i.e.*, extreme hardship, in this instance) conclude that no such a condition existed.[10] This is obviously a demanding test, but appropriately so where all of the conditions of its invocation are present.

■ I cannot conclude that it is reasonably likely that plaintiff will meet that test on trial of this matter. They rest their argument in this connection importantly upon two facts: first, that to decline to grant the exemption would only require DP & L to spend more money (either to install new and larger poles along the westerly side of Rt. 10 or to bury the new transmission line) and, second, that DP & L is a private enterprise whose financial welfare is not a legitimate concern of DelDOT. The second point I find difficult to grasp. One would have thought it evident that there is a public interest in the operation of a regulated utility. Due to the power to exercise monopoly pricing cost increases tend to be passed along to users generally (subject, under regulation, to Public Utility Commission approval). Moreover, these costs have important indirect effects on public welfare, most notably on the growth of industrial or commercial economic activities. Thus, it would seem apparent that undue cost to the utility would be a prime example of the sort of condition that the Department might reasonably conclude would constitute a hardship justifying exemption from its general rule.

Whether required expenditure of the dollars involved in this instance might be characterized as "an extreme hardship" is something over which reasonable persons might differ. Or so it appears in the present record. That conclusion, however, is inconsistent with the granting of relief where arbitrary action is the premise for relief. Therefore, I cannot conclude that plaintiffs have demonstrated a reasonable probability of ultimately justifying the entry of injunction they seek. The pending motion must therefore be denied.

---

10. Since DelDOT is excused from the provisions of the ALPA, or a statute defining specifically the proper basis for its action (as in *Tate v.* *Miles*), it is under no obligation to·state the basis of franchise decision.