van Gestel, J.
This matter is before the Court on cross motions for summary judgment. The defendant, Ascent Pediatrics, Inc. (“Ascent”), has moved for summary judgment on all counts of the amended complaint (Paper #41). The plaintiffs Triumph-Connecticut Limited Partnership, John D. Howard, Frederick S. Moseley, IV, and John M. Chapman as Trustees of the Triumph Capital Group, Inc. 401(k) Plan and Trust for the Account of Thomas W. Janes, Jeffrey F. Lick and Duane F. Thurman (collectively ‘Triumph”), have cross-moved for summary judgment on Count I only of their amended complaint (Paper #47).
The opening sentence of Triumph’s memorandum in support of its motion announces that “Count I of the Amended Complaint pleads a straightforward claim for breach of an unambiguous provision in a Securities Purchase Agreement documenting the plaintiffs’ equity investment in defendant Ascent Pediatrics, Inc. (“Ascent”).” The second two sentences in Ascent’s memorandum in support of its motion read: “No genuine issue of material fact is raised by any of the four counts of the First Amended Complaint. Instead, the relationship between the parties is controlled by unambiguous contractual provisions with which Ascent indisputably complied, making summary judgment for the Defendant appropriate.” The *539 parties then proceed to argue, at length, why these unambiguous contractual provisions lead inexorably to victoiy for their side of the case.
BACKGROUND
Triumph is a private equity fund that holds private equity investments in non-public companies. Triumph makes highly structured, non-control equity investments in smaller companies with strong management teams. Triumph negotiates, on a deal-by-deal basis, the terms and conditions that are placed in documentation to minimize Triumph’s risk and protect it as a minority investor in a company.
Triumph’s investment in Ascent was one of those transactions. In the negotiations leading up to the investment it is clear that both parties — Triumph and Ascent — were very sophisticated in the matters at hand. Also, each party was represented throughout by two of Boston’s leading corporate law firms. The documentation produced is elaborate, thorough and fully integrated.
In 1997, Triumph invested a total of $7 million in Ascent pursuant to a Securities Purchase Agreement (“SPA”). In connection with the investment, Triumph received certain Warrants to purchase common stock of Ascent. The transaction was accomplished in two steps. On January 31, 1997, under the terms of the SPA, Triumph made a secured loan to Ascent of $2 million. On June 4, 1997, after Ascent raised an additional total of $30 million in a private placement and an initial public offering of its stock, Triumph made a further secured loan to Ascent of $5 million, also pursuant to the SPA. In connection with these two loans, Triumph received $7 million principal amount of secured interest-bearing notes, along with 660,090 Series A Warrants to purchase common stock at $0.01 per share and 256,702 Series B Warrants to purchase common stock at $5.29 per share.
The SPA was amended by an agreement between the parties dated May 31, 1998 (the “SPA Amendment”). Each of the SPA and the SPA Amendment contain a requirement that Ascent seek the Warrant holders’ consent prior to entering into certain specified transactions. The provision, as amended and in force at the time of the alleged breach, is found in Section 8.3(b) of the SPA Amendment, entitled “Restrictions on Certain Sales and Mergers.” It reads, in its entirety, as follows:
The Company [Ascent] shall not, and shall not permit any of its shareholders or Subsidiaries to, become a party to any merger or consolidation of the Company with or into any Person (or an affiliated group of Persons), or sell or enter into any definitive agreement to sell, in one or more related transactions, all or substantially all of the property, assets or Capital Stock of the Company, without the prior written consent of the holders of a majority of the outstanding Warrants, except that (i) any Person may merge or consolidate with the Company so long as the Company is the surviving corporation and such merger is not otherwise prohibited by this Agreement and (ii) the Company or the shareholders may sell all or substantially all of the property, assets or Capital Stock of the Company so long as each holder of Warrants receives cash in exchange for each Warrant Share (as defined in the Warrants) that would be issuable to such holder, in an amount equal to $11.76 (subject to appropriate adjustment in the event of any stock split, stock dividend, recapitalization or other capital reorganization) less the applicable Purchase Price (as defined in the Warrants) required to be paid by such holder for the issuance of such Warrant Share upon exercise of such Warrant.
Both the SPA and the SPA Amendment recite that they “shall be construed, interpreted, and enforced in accordance with the laws of the Commonwealth of Massachusetts, without giving effect to conflict of laws provisions.”
Further, Part IV, Sec. 3 of the SPA Amendment provides: “This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements and understandings, whether written or oral, relating to the amendment or modification of the Triumph Purchase Agreement or the Triumph Warrants.” The “Triumph Purchase Agreement” is recited to be the “Securities Purchase Agreement dated as of January 31, 1997, as amended March 13, 1997 ... among the Company, Triumph and the other purchasers listed on the signature pages thereto.”
Still further, pursuant to the SPA Amendment, Ascent repaid Triumph’s notes in full, with interest, shortly thereafter.
On October 1, 2001, Ascent entered into an Agreement and Plan of Merger (the “Merger Agreement”) with Medicis Pharmaceutical Corporation (“Medicis”) and its wholly owned subsidiary, MPC Merger Corporation (“MPC”). Pursuant to the Merger Agreement, with the approval of the holders of a majority of Ascent’s stock, MPC merged with and into Ascent (the “Merger”). Ascent was the surviving corporation of the Merger, as provided in the Merger Agreement. Ascent did not seek or obtain the consent of Triumph for this transaction.
This merger, which occurred on November 15, 2001, was structured as a reverse triangular merger. It was accomplished pursuant to the laws of the State of Delaware because all parties thereto — Ascent, Medicis and MPC — were Delaware corporations. In a reverse triangular merger, an acquiring company forms a transitoiy subsidiary, which merges into the target company. The shareholders of the target company are given consideration for their shares and their stock is cancelled. The target company remains a corporation, but it becomes a subsidiary of the acquiring company.
*540 As a result of the Merger, the Ascent legal entity remained, but it had all new shareholders. Medicis assumed management and control of Ascent, and there were no Ascent managers and no Ascent officers.
After learning about the impending Merger, Triumph wrote Ascent asking what steps Ascent intended to take to comply with Section 8.3(b). Ascent responded, “Since Ascent Pediatrics will be the surviving corporation in the contemplated merger the restrictions set forth in Section 8.3 of the Securities Purchase Agreement are not applicable.” This case was filed on November 9, 2001.
DISCUSSION
Summary judgment is granted where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. Theos & Sons, Inc. v. Mack Trucks, Inc., 431 Mass. 736, 737 (2000); Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 281 (1997); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of fact. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989).
In this case, the Court is dealing with sophisticated parties, represented at all times in the underlying transactions by skilled counsel, and now advocating aggressively on cross motions in which both sides contend that the matter is controlled by unambiguous contractual language and no material facts are in dispute.
The plain language of the Securities Purchase Agreement, as amended, becomes critical. The interpretation of an unambiguous agreement is an issue of law for the Court. Contract language must be construed in its usual and ordinary sense. 116 Commonwealth Condominium Trust v. Aetna Cas. & Surety Co., 433 Mass. 373, 376 (2001); Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998). A contractual provision is ambiguous “only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” Citation Ins. Co., supra, 426 Mass, at 381. The mere fact that parties disagree on the proper construction of contractual language, however, does not necessarily establish ambiguity. Lumbermans Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995).
“It is also elementary that an unambiguous agreement must be enforced according to its terms.” Schwanbeck v. Federal-Mogul Corp., 412 Mass. 703, 706 (1992).
“The object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background and purpose.” USM Corp. v. Arthur D. Little Systems, Inc., 28 Mass.App.Ct. 108, 116 (1989). The Court must act in a way to give effect to the contract as a rational business instrument in order to carry out the intent of the parties. Starr v. Fordham, 420 Mass. 178, 192 (1990). Even in the case of an ambiguous agreement, interpretation is a matter of law for the Court except insofar as it may turn on facts in genuine dispute. Gross v. Prudential Ins. Co. of America, Inc., 48 Mass.App.Ct. 115, 119 (1999).
Justice, common sense and the probable intention of the parties upon consideration of the words in question are guides to the construction of a written contract. City of Haverhill v George Brox, Inc., 47 Mass.App.Ct. 717, 720 (1999).
The language of Section 8.3(b) is not ambiguous. Its plain meaning must, therefore, be given effect. The Court must “read the [contract] as written and ‘[is] not free to revise it or change the order of the words.’ ” Hakim v. Massachusetts Insurers’ Insolvency Fund, 424 Mass. 275, 280-81 (1997); Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 147 (1984).
The Court must be careful not to impose its own views on the contracting parties or to let matters outside the four corners of the instruments that are specifically anticipated and addressed therein overwhelm or change the documents themselves. “[A]greements are made to be performed, and relief should be given in the absence of special circumstances showing that it would be inequitable to do so.” Freedman v. Walsh, 331 Mass. 401, 406 (1954). No special circumstances have been demonstrated here. It is not the role of the Court to alter the parties’ agreement. “Even if it be found that the contract, according to its true meaning . . . fails to become operative, it is not for the [C]ourt, in order to give it operation, to suppose a meaning which the parties have not expressed . . .” Shoe & Leather Nat’l Bank v. Dix, 123 Mass. 148, 150 (1877). In short, this is not the time for the Court to attempt to be smarter than the parties. See, e.g., Rogaris v. Albert, 431 Mass. 833, 835 (2000).
There being no ambiguity, the Court draws the meaning of the agreement solely from the language chosen by the sophisticated and skillfully represented parties.
Section 8.3(b) deals with two separate situations. The first situation relates to a “merger or consolidation” of Ascent with or into another entity. The second situation relates to the sale of “all or substantially all the property, assets or Capital Stock” of Ascent. Both situations require “the prior written consent of the holders of a majority of the outstanding Warrants.”
There are, however, two exceptions to the consent requirement, one for each situation. In the case of a merger or consolidation, no consent of the Warrant holders is required “so long as [Ascent] is the surviving corporation and such merger is not otherwise prohibited by” the SPA, as amended. In the case of a sale of all or substantially all of Ascent’s property, assets or Capital Stock, no consent of the Warrant holders is required “so long as each holder of Warrants *541 receives cash in exchange for each Warrant Share” in the amount designated. Both exceptions, however, cannot be read to apply to both situations.
The Court’s reading of the two exceptions as being separate from one another and as applying to two different situations does not, however, end the discussion. The Court next must determine whether the Ascent/Medicis/MPC transaction was a merger[2] or a sale of property, assets or Capital Stock.
Ascent, Medicis and MPC are each Delaware corporations. As such, their transaction must be examined under Delaware law. See, e.g., Harrison v. NetCentric Corporation, 433 Mass. 465, 471-72 (2001); G.L.c. 156B, Sec. 79. Indeed, the Merger Agreement so provides in Sec. 10.08 thereof.
There is a difference legally between a merger and a sale.
The statutory conversion of stock in a constituent corporation into stock in the surviving corporation that is effected by a stock for stock merger ought not be construed to constitute a sale, transfer or exchange of stock for purposes of an agreement among shareholders restricting their power to transfer their stock... A merger between or among Delaware corporations is not a stockholders act...; it is a corporate act, albeit one requiring for its effectuation the approval of a majority of the shareholders of the corporation. When duly effectuated, such a corporate act effects by operation of law a transmutation of the stock interest in a constituent corporation.
Shields v. Shields, 498 A.2d 161, 167 (Del.Ch. 1985).
A merger may be said to “involve” a sale of assets, in the sense that the title to the assets is by operation of law transferred from the constituent corporation to the surviving corporation; but it is not the same thing. It is . . . something quite distinct, and the distinction is not merely one of form . . . but one of substance . . . The scope of the (General Corporation Law provisions relating to mergers and to sale of corporate assets] may to some extent overlap; but this is not to say that the two procedures differ only in form. They are, in general, distinct and designed for different ends.
Sterling v. Mayflower Hotel Corp., 93 A.2d 107, 112 (Del. 1952).
Thus, under Delaware law, what occurred in the transaction among Ascent, Medicis and MPC was a merger, not a sale of property, assets or Capital Stock. For that reason, the second exception in Sec. 8.3(b)(ii), which relates only to a sale, does not apply.
Further, since Ascent was the “surviving corporation” under the Merger Agreement, and by both Delaware and Massachusetts law, the exception in Sec. 8.3(b)(i) does apply.
Also, under the circumstances, there is no showing that Ascent failed in any way to adhere to the requirements of the Warrants themselves.
Consequently, there is no breach of the Securities Purchase Agreement, of the Warrants, or of the implied covenant of good faith and fair dealing. Neither is there any support for a claim of a violation of G.L.c. 93A.
ORDER
For the foregoing reasons, the Defendant’s Motion for Summary Judgment (Paper #41) is ALLOWED and the Plaintiffs’ Motion for Summary Judgment on Count I of Amended Complaint (Paper #47) is DENIED. A final judgment shall enter accordingly.

There is nothing in the SPA that would otherwise prohibit such a merger.