801 A.2d 1212

SEVEN SPRINGS FARM, INC., a Pennsylvania
Corporation, Appellee

v.

Lynda M. Dupre CROKER, Appellant.

Lynda M. Dupree, on behalf of the Phillip
Dupre Family, Appellant

v.

Seven Springs Farm, Inc., Along with Certain of its Directors,
James M. Crowley, Denise M. Dupre, James M. McClure, Joyce
S. Monigal, Richard G. Patton, Charles N. Santry, Frank S.
Sujansky, and James V. Sujansky, Appellees.

Supreme Court of Pennsylvania.

Argued Sept. 10, 2001.

Decided July 16, 2002.

Brian Edward Barbin, Harrisburg, Dominic Ciarimboli, Greensburg, Andrew J. Gleason, Harrisburg, for appellants, Lynda Dupree Croker and Lynda M. Dupree, on behalf of the Phillip Dupre Family.

David Mario Aceto, Samuel W. Braver, David L. McClenahan, Pittsburgh, Daniel W. Rullo, Somerset, Robert L. Byer, Ellen Lynn Surloff, Pittsburgh, for appellees, Seven Springs Farm, Inc., a PA Corp. with certain of its directors, James M. Crowley, Denise M. Dupre, James M. McClure, Joyce S. Monigal, Richard G. Patton, Charles N. Santry, Frank S. Sujansky and James V. Sujansky.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

## OPINION

Justice NIGRO.

We granted allowance of appeal to consider whether the Superior Court erred in holding that a cash-for-stock merger did not trigger the right of first refusal in a closely-held corporation's buy-sell agreement. For the reasons that follow, we affirm.

Seven Springs Farm, Inc. ("Seven Springs") is a 5000–acre, year-round resort, with both skiing facilities and a conference center. It was founded in 1932 by Adolph and Helen Dupre, and incorporated as a Pennsylvania corporation in 1959. The original shareholders were Helen Dupre and her three children: Herman Dupre, Phillip Dupre and Luitgarde Dupre Sujansky. In January of 1969, with a lawyer's assistance, the shareholders entered into an "Agreement Affecting the Transfer of the Common and Preferred Stock of Seven Springs Farm, Inc." (the "Buy–Sell Agreement"), providing in relevant part:

1. *Transfers to Members of Family.* Any shareholder may transfer all or part of his stock by gift or otherwise ... to or for the sole benefit of his children....

\* \* \*

2. *Option to Corporation.* Except as provided in paragraph 1, no Stockholder, estate of a Stockholder or Transferee who has received any stock in accordance with the provisions of paragraph 1, or any other transferee, shall transfer, assign, sell, pledge, hypothecate, mortgage, alienate or in any other way encumber or dispose of all or any part of his stock in the Corporation, or certificates of ownership representing same, now owned or hereafter acquired by him, without first giving to all other Stockholders and the Corporation at least 30 days written notice ... of his intention to make a disposition of his stock.... Within the 30 day period a special meeting of all of the Stockholders shall be called by the Corporation.... At such meeting all the stock of the Stockholders or transferee shall be offered for sale and shall be subject to an option to purchase or to retire on the part of the Corporation, which option shall be exercised, if at all, at the time of such meeting....

The filing of a voluntary or involuntary petition in bankruptcy by any Stockholder and the occurrence of any insolvency of any Stockholder, the making of an assignment for the benefit of creditors or the entrance into any composition agreement with creditors shall be construed as an offer to

sell all of the shares of such Stockholder to the Corporation under the provisions of this agreement.

3. *Option to Stockholders.* If all of the stock of the Stockholder . . . desiring to make a disposition thereof is not purchased by the Corporation in accordance with paragraph 2, then the stock not so purchased or retired shall be offered for sale and shall be subject to an option on the part of each Stockholder to purchase a proportionate share, by class, which options shall be exercised, if at all, at the time of the meeting of Stockholders called pursuant to the provisions of paragraph 2, at a price and under the terms provided for in paragraphs 6 and 7.

R. 416a–417a. "Stockholders" is defined at the start of the agreement to "collectively refer to" Helen Dupre, Phillip Dupre, Herman Dupre and Luitgarde Dupre Sujansky. The agreement also provides, however, that it shall be binding on the Stockholders' heirs and assigns. In fact, over the years, Helen Dupre's children have passed on their stock to their various offspring and today, the corporation has 45 stockholders, all of whom are now bound by the terms of the Buy–Sell Agreement.

On December 6, 1997, the existing Stockholders, again with a lawyer's assistance, amended the Buy–Sell Agreement to provide that the holders of 75% of the company's stock could waive the restrictive transfer provisions for any sale of stock that imputes to the corporation a total capitalization of $70,000,000 or more. According to the amendment, all other provisions of the Buy–Sell Agreement remained in "full force and effect" and were thereby "ratified and confirmed." R. 430a.

At present, Seven Springs has 750 shares of common stock, which are equally divided in thirds among the respective descendents of Herman Dupre, Phillip Dupre and Luitgarde Dupre Sujansky. In 1998, two of the three family groups (holding two-thirds of the stock) voted to pursue a sale of the company to Booth Creek Ski Holding, Inc. ("Booth Creek"). The third family group, Phillip Dupre's descendents, represented here by Lynda M. Dupre Croker ("Croker"), voted

against the sale, and took the position that any agreement with Booth Creek would be subject to the shareholders' right of first refusal in the Buy–Sell Agreement. Nevertheless, a Merger Agreement and Plan of Merger were drafted, approved by the Seven Springs Board of Directors on August 18, 1998, and prepared for ratification by the shareholders.

Under the terms of the Merger Agreement, a subsidiary of Booth Creek, Booth Creek Ski Acquisitions, Inc., would be merged into Seven Springs, with Seven Springs as the surviving corporation. The agreement also provided that by virtue of the merger, the existing shares of Seven Springs would be "converted" into the right to receive cash and certain deferred cash payments, and the shares of the Booth Creek subsidiary would be "converted" into shares of Seven Springs. Notably, given the parties' dispute, the Merger Agreement conditioned both Seven Springs' and Booth Creeks' obligations to effect the merger on a judicial determination that the Buy–Sell Agreement was inapplicable to the merger.

In recognition of that provision, Seven Springs and certain of its directors filed a declaratory judgment complaint, seeking a determination that the Buy–Sell Agreement was not applicable to the proposed transaction. Three days later, Croker also filed a complaint, requesting a declaratory judgment to the contrary. The cases were consolidated, discovery was expedited, and the case proceeded to trial.

After hearing evidence, the trial court concluded that the proposed merger was not within the scope of the Buy–Sell Agreement. The Superior Court affirmed. Croker petitioned for *en banc* review, and an *en banc* panel of the Superior Court affirmed as well. We granted Croker's Petition for Allowance of Appeal and now affirm.

 The issue presented by this case is, at its heart, one of contract interpretation. The primary objective of a court when interpreting a contract is to ascertain the intent of the parties. *See Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Board,* 559 Pa. 56, 739 A.2d 133 (1999). When "a written contract is clear and unequivocal, its meaning must

be determined by its contents alone." *Robert F. Felte, Inc. v. White*, 451 Pa. 137, 302 A.2d 347, 351 (1973)(quoting *East Crossroads Center, Inc. v. Mellon–Stuart Co.*, 416 Pa. 229, 205 A.2d 865, 866 (1965)). Courts are not to assume that a contract's language was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized. *Steuart v. McChesney*, 498 Pa. 45, 444 A.2d 659, 662 (1982).

 Here, the parties agree that the language of the Buy–Sell Agreement is both clear and unambiguous.[1] They nevertheless disagree as to what the "clear and unambiguous" language actually means. The focus of the dispute is on the meaning of the phrase "no Stockholder ... shall transfer, assign, sell, pledge, hypothecate, mortgage, alienate or in any other way encumber or dispose of all or any part of his stock in the Corporation." Croker contends that the phrase covers the contemplated merger, which, in her view, is nothing more than a thinly veiled Stockholder's sale of stock. Seven Springs, on the other hand, takes the position that the merger is a corporate act, not a "Stockholder" act, and that, in any event, the "conversion" of shares that is to be accomplished with the merger does not constitute a "sale" or other "disposition" of stock.

 To resolve this dispute, the Buy–Sell Agreement must be read in conjunction with Pennsylvania's Business Corporation Law ("the BCL") and, in particular, those provisions of the BCL that pertain to corporate mergers. Corporations are creations of state law and can exercise only those powers conferred upon them by statute. *See Lauman v. Lebanon Valley R. Co.*, 30 Pa. 42 (1858); 15 W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations*, § 7048 (rev. ed.1999). In a Chapter of the BCL entitled "Fundamental Changes," the BCL specifically authorizes the merger of two

---

1. The meaning of an unambiguous written instrument presents a question of law for resolution by the court, *Community College of Beaver County v. Community College of Beaver County, Soc. of the Faculty*, 473 Pa. 576, 375 A.2d 1267, 1275 (1977), and is subject to de novo review. *Halpin v. LaSalle University*, 432 Pa.Super. 476, 639 A.2d 37, 39 (1994), *alloc. denied*, 542 Pa. 670, 668 A.2d 1133 (1995).

domestic business corporations, stating that "[a]ny two or more domestic business corporations . . . may, in the manner set forth in this subchapter, be merged into one of the domestic business corporations, designated in this subchapter as the surviving corporation. . . ." 15 Pa.C.S. § 1921(a). Among the types of mergers contemplated is a cash-for-stock merger, in which shares are converted into, or exchanged for, cash, and the certificates evidencing the shares are surrendered. 15 Pa.C.S. § 1922(a)(3). To accomplish such a merger, the statute requires that a plan of merger be prepared. 15 Pa.C.S. § 1922(a). The Board of Directors must then adopt a resolution approving the plan of merger and direct that the plan be submitted to a vote of the shareholders.[2] 15 Pa.C.S. § 1922(c). Under the BCL, "[t]he plan of merger . . . shall be adopted [by the corporation] upon receiving the affirmative vote of a majority of . . . shareholders . . . of each of the domestic business corporations that is a party to the merger. . . ." 15 Pa.C.S. § 1924(a). "Upon the adoption of the plan of merger . . . by the corporations desiring to merge . . ., articles of merger . . . shall . . . be executed by each corporation . . . and shall . . . set forth . . . [among other things, t]he manner in which the plan was adopted by each domestic corporation." 15 Pa.C.S. § 1926. "Upon the merger becoming effective, the . . . corporations parties to the merger . . . shall be a single corporation which . . . shall be the corporation designated in the plan of merger as the surviving corporation. . . ." 15 Pa.C.S. § 1929(a). Moreover, "[t]he separate existence of all corporations parties to the merger . . . shall cease, except that of the surviving corporation. . . ." *Id.*

Based on these statutory provisions, we need not decide the issue of whether the merger in the instant case involves a "disposition of" stock, because we agree with Seven Springs that a merger is a corporate act, not a shareholder act, and therefore does not fall within the Buy–Sell Agreement's restrictive transfer provisions. As stated above, the BCL specifically empowers the *corporation* to merge. 15 Pa.C.S. § 1921.

**2.** In certain circumstances, none of which are applicable here, approval of the shareholders is unnecessary. *See* 15 Pa.C.S. § 1924(b).

It explicitly lays out the steps that the *corporation* must take to accomplish the merger. 15 Pa.C.S. §§ 1922–1929. To that end, it requires the *corporation* to both adopt the plan and execute the articles of merger. *See* 15 Pa.C.S. §§ 1924(a), 1926, 1929. Moreover, even after the shareholders vote in favor of the merger, the *corporation* has the power to terminate the transaction pursuant to the provisions of the plan of merger. 15 Pa.C.S. § 1924(c).

Under these circumstances, the use of the term "Stockholders" in the restrictive transfer provisions is telling. Had the parties, who are owners of this multi-million dollar corporation, and their counsel intended to prohibit the corporation from merging with another and thereby converting corporate shares to a right to receive cash, they would have included in the Buy–Sell Agreement or its amendment a specific prohibition on *corporate* (as opposed to stockholder) actions, perhaps even mentioning mergers specifically.[3] As the Buy–Sell Agreement is written, with "Stockholders" defined to include only individual shareholders, there is simply no indication in the agreement that fundamental corporate actions such as mergers were meant to be restricted.

█ Croker points out that the Buy–Sell Agreement contains a provision requiring the corporation to "perform every act that may be required of it to effectuate the provisions of th[e Buy–Sell] Agreement," including "not transfer[ring] or reissu[ing] any of its shares of stock in violation of th[e] Agreement." Buy–Sell Agreement at ¶ 11, R. 423a. She then argues that this general provision prohibits the corporation from accomplishing the merger contemplated here. We do not agree. In Pennsylvania, restrictive transfer provisions are strictly construed. *See Rouse & Assoc., Inc. v. Delp,* 442 Pa.Super. 226, 658 A.2d 1383, 1384 (1995); *In re Trilling & Montague,* 140 F.Supp. 260, 261 (E.D.Pa.1956). "Because alienation is an inherent attribute of corporate stock ...

---

**3.** The blatant omission of any reference to mergers, in conjunction with the pointed clarification that a Stockholders' bankruptcy or assignment of shares to creditors triggers the right of first refusal, underscores the parties' intent not to hinder the corporation's right to merge.

restrictive agreements are not favorites of the law and are strictly construed." *Rouse*, 658 A.2d at 1384. Accordingly, "[i]n the absence of express language imposing . . . a [particular] restriction, no intent to impose such a restriction will be inferred." *Id.* at 1385. Under these well-established rules, the generic language Croker cites cannot possibly be read so broadly as to prohibit statutorily-sanctioned mergers.

■ Alternatively, Croker would have us find that the fact that the shareholders must vote on the plan of merger somehow transforms the fundamental corporate act into a "Stockholder" transaction giving rise to the right of first refusal. Again, we cannot agree. Although Seven Springs was required under the BCL to obtain the approval of a majority of the stockholders, a vote in favor of the merger did not result in the *Stockholders* "disposing of" their shares, as is restricted under the Buy–Sell Agreement. Rather, a favorable vote by a majority of Stockholders merely authorized the *corporation* to take independent action with respect to the shares. As discussed at length above, the Buy–Sell Agreement, by its explicit terms, places no restrictions on that corporate action.[4]

■ Similar to the instant case, in *Shields v. Shields*, 498 A.2d 161 (Del.Ch.1985), *appeal denied*, 497 A.2d 791 (Del. 1985), the shareholders in a closely-held family corporation entered into a restrictive transfer agreement, which required any shareholder desiring to "sell, give, pledge, dispose of by will, gift in trust or in any manner otherwise dispose of his or her stock" to first offer that stock to the other shareholders at book value. *Id.* at 167. The majority of shareholders wanted to avoid the effects of the restrictive transfer agreement, so, over the objections of certain other shareholders, the corporation created a subsidiary, and effectuated a stock-for-stock

---

4. We similarly reject Croker's argument that a Stockholder's "surrender" of his or her stock certificates pursuant to the Plan of Merger is a Stockholder's "disposition" of stock which triggers the provisions of the Buy–Sell Agreement. Under the terms of the Plan of Merger, by the time of the surrender, the shares represented by the certificates have ceased to exist and instead have been converted into the right to receive cash. The surrender of the certificates cannot possibly be deemed a "disposition" of shares that no longer exist.

merger with that subsidiary, with the subsidiary as the surviving corporation. The majority shareholders then entered into a new, less-restrictive agreement governing transfer of their shares. The minority shareholders challenged the merger, contending that it constituted a "sale or disposal" of the family stock and thus gave rise to their right of first refusal. The Delaware court disagreed, stating:

> The statutory conversion of stock in a constituent corporation into stock in the surviving corporation that is effected by a stock for stock merger ought not be construed to constitute a sale, transfer or exchange of that stock for purposes of an agreement among shareholders restricting their power to transfer their stock. A merger between or among Delaware corporations is not a stockholders act of the kind the [Buy–Sell Agreement] sought to restrict; it is a corporate act, albeit one requiring for its effectuation the approval of a majority of the shareholders of the corporation. When duly effectuated, such a corporate act effects by operation of law a transmutation of the stock interest in a constituent corporation.

*Id.* at 167 (citations omitted). The court went on to point out:

> That the Buy–Sell Agreement may not be read [to provide for rights of first refusal in the case of a merger] ... is evidenced first by the anomaly it would present of providing ... a right in each party to buy out the substantially equal stock interest of the *other and second by the anomaly that* both would have a right to buy that which has ceased to exist by virtue of the act (i.e., the merger) giving rise to that right.

*Id.* at 168–69. We agree with the *Shields* analysis regarding the distinction between shareholder and corporate acts and note that the same anomalies the *Shields* court recognized would materialize here if we adopted Croker's interpretation of the Buy–Sell Agreement.

Croker attempts to distinguish *Shields* from the instant case by arguing that: (1) the stock-for-stock merger analysis is inapplicable to the cash-for-stock transaction here; (2) there is no indication that the *Shields* corporation, like Seven Springs,

agreed to "perform every act that may be required of it to effectuate the Provisions of [its buy-sell] agreement ..."; (3) the shareholders favoring the merger in *Shields* had offered to sell their shares to the objecting shareholder at their fair market value and the objecting shareholder had refused; and (4) *Shields* involved a request for a preliminary injunction. We find none of these distinctions to be of any relevance here. First, while we recognize the factual distinctions between a stock-for-stock and cash-for-stock merger, the type of compensation provided to shareholders does not affect our conclusion that a merger is a corporate act, not a shareholder act. Second, as explained above, Seven Springs' generic agreement to "effectuate" the provisions of the Buy–Sell Agreement, without more, in no way limited its right to merge. Accordingly, the absence of such a corporate obligation in *Shields* is of no moment. Third, the pre-litigation positions that parties take in attempting to resolve their differences, no matter how reasonable or unreasonable those positions may be, have no bearing on a court's interpretation of an unambiguous contract provision, so that any distinctions between the pre-litigation positions of the parties in *Shields* and those of the parties in the instant case do not impact the purely legal analysis applied here. *See Steuart,* 444 A.2d at 662. And finally, that the *Shields* court was only required to decide, in ruling on a preliminary injunction request, whether the plaintiffs had a reasonable probability of success on the merits, in no way impugns the eminent logic and persuasiveness of its analysis.

Croker nevertheless urges this Court to follow the lead of the Wisconsin Court of Appeals in *Bruns v. Rennebohm Drug Stores, Inc.,* 151 Wis.2d 88, 442 N.W.2d 591 (Ct.App.), *appeal denied,* 446 N.W.2d 285 (Wis.1989). In *Bruns,* Rennebohm Drug Stores, Inc. ("Rennebohm"), a corporate shareholder in a close corporation, Sherman Plaza, Inc., entered into a merger agreement with another corporation, Walgreen Janesville, Inc. ("Walgreen"). The shareholders of Sherman Plaza had entered into a Stock Alienation Restriction Agreement that provided that "in the event any of the ... stockholders of Sherman Plaza, Inc .... determines to sell a part or all of the

shares which he may own," the "board of directors shall . . . have 60 days within which to have the corporation purchase the stock or find another purchaser. . . ." 442 N.W.2d at 592 n. 1. Upon learning of Rennebohm's intended merger, another shareholder in the close corporation, on behalf of the corporation, made a written offer to purchase the Sherman Plaza stock that had been transferred to Walgreen as an asset of Rennebohm. Walgreen argued to the court that the Stock Alienation Restriction Agreement did not apply to the transfer of stock pursuant to the merger, contending that "the transfer occurred by operation of law and not by sale or purchase." *Id.* at 593. The *Bruns* court held that "substance controls over form and that when [Rennebohm] merged with Walgreen Janesville, it sold its Sherman Plaza stock to Walgreen." *Id.* at 595.

Without passing on the wisdom of the *Bruns* analysis, we find it to be completely inapplicable here. As the discussion above makes clear, our decision in the instant case hinges not on whether the merger constituted a "sale" or "disposition" of stock, but rather on the identity of the transferor of the stock and that transferor's obligations under the restrictive transfer agreement. In *Bruns,* the merging corporation was a stockholder, whose actions were specifically restricted by the Stock Alienation Restriction Agreement. That is not the situation in the instant case. Accordingly, Croker's reliance on *Bruns* is simply misplaced.

Finally, Croker argues that reaching a conclusion that the Buy–Sell Agreement does not apply to mergers elevates form over substance, because it permits the shareholders to obtain cash for their shares by way of merger, when they could not accomplish that same objective by selling their shares outright without triggering the right of first refusal. However, "this is an area of law where formalities are important, as they are the method by which sophisticated businessmen make their contractual rights definite and limit the authority of the courts to redo their deal." *Frandsen v. Jensen–Sundquist Agency, Inc.,* 802 F.2d 941, 947 (7th Cir.1986). It is important to note that the parties in this case had legal assistance in both

drafting the Buy–Sell Agreement and reaffirming it in 1997. Their lawyers must be charged with the knowledge not only that "[o]ne consequence of [Pennsylvania's] strict construction approach is that controlling shareholders can use mergers, acquisitions and dissolution to avoid share transfer restrictions," but also that "[t]his ... result can be prevented by express coverage of mergers and acquisitions in the transfer restriction." 12 W. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations,* § 5460.30 (rev. ed.1996). The Buy–Sell Agreement contains no such express coverage of mergers, and it is not for this court to rewrite the parties' contract to cover them. *See Steuart,* 444 A.2d at 662; *Walker v. Saricks,* 360 Pa. 594, 63 A.2d 9, 11 (1949).[5]

For the foregoing reasons, the decision of the *en banc* Superior Court is hereby affirmed.

Justice SAYLOR did not participate in the consideration or decision of this case.

Former Chief Justice FLAHERTY did not participate in the decision of this case.

Justice CASTILLE files a dissenting opinion.

Justice CASTILLE, dissenting.

I must respectfully dissent. The majority reasons that the cash-for-stock merger proposed by appellees is a corporate act, not a shareholder act, and therefore the transaction falls outside the ambit of the stock transfer agreement entered into by the parties (the "Buy–Sell Agreement"). I disagree with this reasoning in two respects.

First, unlike the majority, I believe that the corporation is expressly bound by the Agreement's transfer restrictions.

---

5. We note that our interpretation of the Buy–Sell Agreement by no means makes the right of first refusal either meaningless or empty. Quite to the contrary, the provision, as plainly written, gives shareholders very valuable protection from the possibility that other shareholders will sell their stock to strangers, bringing those strangers into the family fold and leaving the remaining shareholders with unwanted bedfellows. In a closely-held family corporation, such as Seven Springs, such protection cannot be undervalued.

Paragraph 11 of the Buy–Sell Agreement provides, in pertinent part:

> 11. *Agreements by the Corporation.* In consideration of the promises of the Stockholders, the Corporation agrees for itself and for its successors and assignees **that it shall perform every act that may be required of it to effectuate the provisions of this Agreement,** including, but not limited to,
>
>> (a) **it will not transfer or reissue any of its shares of stock in violation of this Agreement or without requiring proof of compliance with this Agreement;**
>>
>> (b) all stock certificates issued by the Corporation during the life of this Agreement shall be endorsed as stated above;
>
> . . . .

Buy–Sell Agreement ¶ 11 (emphasis added). This language, in my view, clearly requires the corporation to give effect to all of the provisions in the Buy–Sell Agreement, including the restrictions on the transfer of stock set forth in Paragraph 2, and, thus, prohibits the merger proposed by appellees.

Citing to the non-binding Superior Court decision in *Rouse & Assoc., Inc. v. Delp,* 442 Pa.Super. 226, 658 A.2d 1383 (1995), as well as a decision from the Eastern District of Pennsylvania, *In re Trilling & Montague,* 140 F.Supp. 260 (E.D.Pa. 1956), the majority posits that this clear and unequivocal language should not be read to prohibit the merger because restrictive transfer provisions are not "favorites of the law" and are to be strictly construed. The majority contends that in the absence of express language precluding mergers, no intent to impose such a restriction should be inferred. **This** Court, however, which is the ultimate judicial authority on matters of Pennsylvania corporate law, has noted that "restrict[ions] [on] the transfer of stock . . . have been recognized in this state as serving a useful purpose, lawful and enforcible [enforceable]." *In re Estate of Mather,* 410 Pa. 361, 189 A.2d 586, 590 (1963) (quoting *Bechtold v. Coleman Realty Co.,* 367 Pa. 208, 79 A.2d 661, 664 (1951)) (further citations omitted).

In addition, Pennsylvania's Business Corporation Law specifically authorizes restrictions on the transferability of shares. 15 Pa.C.S. § 1529(b) ("A restriction on the transfer or registration of transfer of securities of a business corporation may be imposed by the bylaws or by an agreement among any number of securityholders or among them and the corporation."). This Court has repeatedly enforced clear contract language restricting the transfer of stock such as that contained in Paragraph 11 of the Buy–Sell Agreement, and I would enforce the restriction based upon the clear contract language here.

Second, I do not agree that a cash-for-stock merger is solely a corporate act. Pennsylvania's Business Corporation Law expressly provides that a cash-for-stock merger must be adopted by "the affirmative vote of a majority of the votes cast by all shareholders entitled to vote thereon of each of the domestic business corporations that is a party to the merger." 15 Pa.C.S. § 1924(a). While a corporation can propose a cash-for-stock merger, the transaction may not be consummated unless the stockholders have also acted to approve the deal. Indeed, appellees here presented their plan of merger to a vote of the Seven Springs shareholders on October 3, 1998, and a majority of the shareholders approved the transaction.

The majority finds that the fact that the shareholders had to vote on the plan of merger did not "transform[ ] th[is] fundamental corporate act" into a stockholder transaction giving rise to the right of first refusal under the Buy–Sell Agreement. Majority at 211. The majority finds that the stockholder vote in favor of the merger plan did not result in the stockholders "disposing of" their shares, as is restricted under the Agreement. Rather, the majority concludes, the favorable vote by a majority of the stockholders merely authorized the corporation to take independent action with respect to the shares.

It is not, however, the actual "disposition of" shares which triggers the application of the Buy–Sell Agreement, but the "intention" to do so. Paragraph 2 of the Buy–Sell Agreement provides, in pertinent part:

2. *Option to Corporation* Except as provided in paragraph 1, no Stockholder, estate of a Stockholder or transferee who has received any stock in accordance with the provisions of paragraph 1, or any other transferee shall transfer, assign, sell, pledge, hypothecate, mortgage, alienate or in any other way encumber or dispose of all or any part of his stock in the Corporation, or certificates of ownership interest representing the same, now owned or hereafter acquired by him, without first giving to all other Stockholders and to the Corporation at least 30 days written notice by registered mail or personal delivery with receipt acknowledged in writing of his **intention** to make a disposition of his stock.

Buy–Sell Agreement ¶ 2 (emphasis added). In my view, when a majority of the Seven Springs shareholders voted on October 3, 1998 to approve the sale of the company to Booth Creek Ski Holding, Inc. ("Booth Creek"), they manifested their intention to dispose of their stock,[1] triggering the notification and right of first refusal requirements under the Buy–Sell Agreement.[2]

Accordingly, I would reverse the *en banc* decision of the Superior Court. I therefore respectfully dissent.

---

**1.** Although the majority does not reach the question, *see* Majority at 207, I believe that the proposed merger will involve the "disposition of" stock. The phrase "dispose of" is defined as "1. to deal with conclusively; settle; 2. to give away or sell; 3. to get rid of; throw away." Webster's New World Dictionary, 407 (1986). Under the terms of the Agreement of Merger, each share of the company issued and outstanding at the time of the merger shall be converted into the right to receive cash. *See* Agreement of Merger § 2.29(c). In other words, each shareholder will effectively "give away" or "get rid of" his interest in his shares in exchange for the right to receive a cash payment.

**2.** Indeed, the intent of the majority shareholders to dispose of their stock undoubtedly arose prior to the October 3 vote, *i.e.*, at the June 13, 1998 shareholders meeting where the majority shareholders voted to pursue divestiture exclusively with Booth Creek.